203 P.2d 597

**THOMAS et ux. v. STEVENS et al.**

**No. 7419.**

Supreme Court of Idaho.

Feb. 24, 1949.

Rehearing Denied March 21, 1949.

W. H. Langroise and W. B. Bowler, both of Boise, for respondents.

Anderson & Thomas, of Boise, for appellants.

TAYLOR, District Judge.

In April, 1933, the plaintiffs, husband and wife, entered into a written contract with the defendants, by the terms of which they undertook to sell to defendants the following described property in Owyhee County, Idaho, to wit:

Lots 5 and 6 of Section 23, and Lot 7 of Section 22, and the NW¼ NW¼ of Section 26, all in Twp. 5 S, R. 5, E. B. M.

The plaintiffs had no title to approximately 12 acres of Lots 5, 6, and 7 lying north of "the Smith, Kerry and Chase line", the rest of the land was community property of the plaintiffs. The contract was drawn in triplicate. It was fully executed by the defendants, and was signed by plaintiff, Arthur R. Thomas, at the time, but was not signed by Mrs. Thomas nor acknowledged by either of the plaintiffs until January 19, 1938. At which time one copy only was signed and acknowledged. Neither the copy which plaintiff Thomas mailed to defendants, nor the one retained by him were ever signed or acknowledged by Mrs. Thomas. The copy which was ultimately completed was originally sent to the Bruneau State Bank, at Bruneau, Idaho, where, by its terms, it was to have been placed in escrow. Thereafter the bank returned this copy to plaintiff Thomas because it was not signed by Mrs. Thomas and was not acknowledged. Just when it was returned is not shown. But, Thomas testified "it was probably a couple of years afterward, or it may have been longer, but it laid there on my desk for some time." And in answer to the question: "And you had it in your desk for a long period of time?" "It was around there among some papers and lying on my desk there."

The defendant, E. L. Stevens, testified as follows:

"Q. And when did you next hear about the deal? A. Why, when they sent, when they sent us one. Thomas mailed us one with his signature on, but Mrs. Thomas didn't sign it, and I was on my way out to the Junipers to our homestead and I stopped at the Bank, and the banker had one there, the cashier at the Bank, and a deed of different date, and we looked at the papers, and we sent that back for Mrs. Thomas' signature and the deed drawed up to date, because we didn't consider that deed was good."

And,

"Q. But on the deal in '33 did you ever find out why Mrs. Thomas didn't sign? A. No. We were gone out to the homestead several months before we came in,

and when we came in, why, I stopped at the Bank and went in, and she said they hadn't sent any contract back, and we just figured that they had changed their minds and didn't want to close the deal. That is the way we thought it out."

This, together with the fact that defendants did nothing with the land itself as required by the contract, would indicate that it was sent back to Thomas shortly after it reached the bank, at least by the spring of the year 1933.

On January 19, 1938, on advice of the attorney, who represented them at that time, the plaintiff, Bertha Thomas, signed, and both plaintiffs acknowledged the contract, and the attorney sent it to the Recorder's office at Murphy, Owyhee County, where it was recorded on January 22, 1938.

Under date of July 29, 1938, the plaintiffs and defendants entered into a written "Memorandum Agreement" which was a preliminary agreement in which the parties contemplated the execution of a contract for the sale by plaintiffs to defendants of the same land, for $2000.00, payable in four installments of $500.00 each, August 1, 1940, '41, '42 and '44. These installments were to be "Represented by notes in usual form but without interest secured by second mortgage on above described land and all other real estate holdings of second parties." The Memorandum further provided "Plan of second parties is to execute first mortgage on above land for approximately $1500.00. Incidentally

deal requires payment of all delinquent taxes. Deal is merger of all previous negotiations and waiver of mutual claims between parties. Formal documents embodying above agreement to be executed and delivered as soon as first mortgage can be arranged." This document was signed by the parties, but not acknowledged. In keeping with this agreement the defendants made application to the State for a first mortgage loan on plaintiffs' land for $1500.-00. The Attorney General found the title defective, and required that it be quieted. Defendants prosecuted to judgment an action quieting title in themselves. Plaintiffs were not made parties to that action. In the meantime the State discontinued making loans, and for that reason the loan was not obtained, and the agreement of July 29, 1938, was not consummated.

The contract of 1933 required defendants to pay all taxes, and it appears that they did pay all taxes up to 1945, but not without delinquency. All taxes on the land both north and south of the "Smith, Kerry and Chase line" were allowed to become delinquent from 1932 on. The land north of the line was sold by the county for such delinquency in 1936, and was purchased by defendant E. L. Stevens, in his own name for $12.50. The land south of the line was sold by the county for such delinquency, August 15, 1938, and was purchased by defendant E. L. Stevens, in the name of Arthur R. Thomas. Whether this was done in pursuance of the agree-

ment of July, 1938, to clear the title for the contemplated loan from the State is not clear. Being asked how that occurred, the defendant, E. L. Stevens, testified: "Well, we had some taxes that was delinquent, and we happened down to Murphy, and it was put up for sale, and I just bought it in for him to save it for him." However that may be, it does not appear that defendants paid taxes under the terms of the contract of 1933, or because of that contract.

The evidence is somewhat conflicting as to possession. The plaintiff Thomas testified that the defendants had continuous possession. The record shows that the plaintiffs acquired the property in 1919, and occupied it as their home until 1926, when they moved to Boise. After that the land has continued unoccupied except that the defendants occupied the house thereon during short intervals in the fall of the year "when we came down from the homestead at various times." The homestead was "proved up on" in 1937, and then the defendants moved into the house, and lived there for "a year and a half" and "then at odd spells, mostly in the fall of the year" until 1941, when they moved into their present home, seven miles distant, where they have lived continuously since.

The plaintiff, Arthur R. Thomas, testified the house was located on the south side of the "Smith, Kerry and Chase line," on the property owned by him. Defendants testified it was on the north side of the line, on the property which they purchased from the county. On the other aspects of possession there is no conflict. The contract required defendants to "seed all tillable land this year." They did not fence, improve, till, seed, graze or otherwise use or occupy any of the land.

On February 22, 1945, the plaintiffs tendered to defendants an abstract of title and warranty deed and demanded payment of the purchase price of $3000.00 fixed by the terms of the contract of April 6, 1933. The defendants ignored the tender, and plaintiffs brought this action for the purchase price and tendered the deed into court.

The trial court made findings not materially differing from the foregoing statement of facts, except that it found that defendants held continuous possession of the property from the date of the contract to the present. In its conclusions the court recognized the invalidity of the contract prior to its execution and acknowledgment by Mrs. Thomas, but concluded that by occupying the property, paying taxes thereon and quieting title thereto in themselves after the completed contract was recorded, the defendants are "estopped from taking advantage of any prior invalidity thereof."

Judgment was entered for the plaintiffs for $3000.00, less the sum of $12.50 paid by defendants for the outstanding title to the part of the property not owned by plaintiffs with interest from February 23, 1945.

The conclusion that the defendants are estopped and that the contract is valid and binding upon them is assigned as error. This presents the controlling issue in the case.

■ It is the long established law of this state that a contract to convey community real property which is not signed and acknowledged by both husband and wife is void. Childs v. Reed, 34 Idaho 450, 202 P. 685; McKinney v. Merritt, 35 Idaho 600, 208 P. 244; Hart v. Turner, 39 Idaho 50, 226 P. 282; Elliott v. Craig, 45 Idaho 15, 260 P. 433; Burnham v. Henderson, 47 Idaho 687, 278 P. 221; Shepherd v. Dougan, 58 Idaho 543, 76 P.2d 442; Intermountain Realty Co. v. Allen, 60 Idaho 228, 90 P.2d 704, 122 A.L.R. 647; Little v. Bergdahl Oil Co., 60 Idaho 662, 95 P.2d 833; Durant v. Snyder, 65 Idaho 678, 151 P.2d 776; Hancock v. Elkington, 67 Idaho 542, 186 P.2d 494.

This court has also held that such a contract is unenforceable, against strangers to the community, for want of mutuality, and that the requisite mutuality must exist at the inception of the contract. Childs v. Reed, supra; Elliott v. Craig, supra; Zaring v. Lavatta, 36 Idaho 459, 211 P. 557.

■ The contract made in April, 1933, being void could not be revived and given validity by the signing and acknowledgment thereof, by the wife, nearly five years after its inception.

■ Nor do we think the evidence sufficient to establish an estoppel against the defendants. The plaintiffs were guilty of laches in allowing the uncompleted contract to lie around among their papers for nearly five years before attempting to assert it. Such possession as the defendants had was not sufficient to show an assertion of dominion over the property by them. As defendant Byron Stevens testified "It was sort of a camp," occupied by them at short intervals while they were homesteading. After the homestead had been completed, they lived in the house for a year and a half. But that was after E. L. Stevens had acquired title to the part of the land upon which they thought the house stood. Although the contract required them to farm the tillable land and deposit the proceeds of all crops to the credit of the plaintiffs with the escrow holder, the defendants did no farming and deposited no proceeds. This fact must have been known to plaintiffs. Yet they did nothing. The record indicates that through the years 1933 to 1938 both parties regarded the contract as abandoned. The action to quiet title was not an assertion of ownership by defendants, but merely an attempt on their part to comply with the agreement of July 29, 1938. Failing to get the loan that agreement was likewise abandoned. Through all the years involved in the negotiations between these parties, the defendants did nothing, which would lead plaintiffs to believe that they recognized the contract, or which caused the plaintiffs to change their position in re-

liance upon it, or in relation to the property.

Lastly, the agreement of July 29, 1938, providing that "Deal is merger of all previous negotiations and waiver of mutual claims between parties," although not consummated, is a written recognition of the fact that no previous binding contract existed between the parties.

The judgment is therefore reversed, with directions to dismiss the action. Costs to appellants.

HOLDEN, C. J., and GIVENS, PORTER and HYATT, JJ., concur.